**STATE**

v.

**Jerome ST. AMANT.**

**No. 86–524–C.A.**

Supreme Court of Rhode Island.

Feb. 9, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

William A. DiMitri, John T. Bucci, Jackvony & DiMitri, Providence, for defendant.

## OPINION

SHEA, Judge.

This case is before the Supreme Court on the appeal of the defendant, Jerome St. Amant, from conviction on two counts of first-degree sexual assault and two counts of second-degree sexual assault. We affirm in part and reverse in part.

The victim in this case was defendant's stepdaughter, born on September 27, 1968. The defendant had married the mother when the victim was two years of age. The child had always called him Dad and was closer to him than to her own father, whom she saw about once a week. The three lived together until November of 1984 when defendant and the mother separated.

The victim has suffered from a profound hearing impairment from her very earliest years. She has used hearing aids in both ears since the age of four, and she reads lips quite successfully. At trial she used a mechanical device known as a "phonic ear" in order to hear and respond to direct and cross-examination.

The testimony established that in October 1981, one month after her thirteenth birthday, defendant, informing the girl that he "wanted to tell [her] how [her] body works," directed her to remove her clothes, which she did. In her parents' bedroom defendant then "fondled with [her] vagina" with his fingers and told her to look into a small vanity mirror he placed between her legs.[1] Her mother was at work at the time.

In December of 1981 defendant again told the girl that he wanted to "show her how [her] body works" and wanted to see if she "could feel good." He told her to remove her clothes and lie on the living room floor. He then "fondled" her vagina and inserted his penis. She felt pain and "told him to stop" and "was trying to push away from him." He did not stop but instead told her to relax. She testified that during the assaults she would try "to crawl away from him." She never initiated or suggested the sexual contact. After December 1981 these incidents occurred early every Monday evening after defendant came home from work and before the girl's mother returned from work.

---

1. In her testimony the young girl described the repeated assaults in full detail that we need not recount in this opinion.

The incidents stopped in June of 1982 but resumed in June of 1983 at defendant's initiation. During the summer of 1983 defendant had intercourse and oral sex with the victim. He told her that other fathers had such relations with their daughters.

In August 1983 the young girl told defendant that she wanted these incidents to stop, a result of which was that defendant stopped speaking or communicating with her. In September of 1983 she told him she could not stand the "silence" anymore and "gave in" and resumed sexual relations with him.

The girl testified that she did not tell her mother about the sexual abuse because defendant told her that the knowledge would cause the mother to have a nervous breakdown. This worried her because if her mother were in the hospital, she would be alone in the house with defendant and she "didn't want that."

When questioned, the girl said that defendant was the "head of the household" and had always been in charge of her discipline. He helped her with her schoolwork, was a stern taskmaster, and at times lost patience and yelled at her. Once, when she was about six years old, defendant struck her, causing a bruise on her leg.

The defendant's sexual abuse stopped about four months before the girl and her mother moved out of the house because of marital problems. Shortly thereafter, she told her mother about the sexual activity.

On cross-examination the girl stated that she loved defendant "as a father" but "after these incidents started occurring [she] was afraid of him and didn't like what he was doing to her." She also said that although she "was uncomfortable when he was doing the activities with [her]," the incidents were never physically forced upon her.

The defendant testified in his own behalf and denied sexual contact with the victim. He actually claimed that he suffered a problem of impotency for a period, the

dates of which coincided with the period during which the victim said the series of sexual assaults had occurred. His testimony further established without question that he was the dominant force in the household who exercised unchallenged parental authority.

At the conclusion of the evidence defendant moved for directed verdicts of acquittal on all four counts, which motions were denied. However, in view of our holding in *State v. Jordan*, 528 A.2d 731 (R.I. 1987), it is clear that defendant's convictions on counts 1 and 2 must be vacated and the charges dismissed.

■ These counts are based on alleged violations of G.L. 1956 (1981 Reenactment) §§ 11–37–2, as amended by P.L. 1984, ch. 355, § 1, and 11–37–4, as amended by P.L. 1984, ch. 59, § 1, which prohibit sexual contact or penetration of a person "thirteen (13) years of age or under."[2] In *State v. Jordan*, we held that the phrase "thirteen years of age or under" as used in § 11–37–8.1, as amended by P.L. 1984, ch. 59, § 2, referred to victims who were assaulted on or before their thirteenth birthday, not to victims who are between thirteen and fourteen years of age. 528 A.2d at 734. The state concedes that under *Jordan* defendant was entitled to a judgment of acquittal on counts 1 and 2. Therefore, judgments of conviction in regard to those counts are vacated, and those counts are dismissed.

The defendant next asserts that the trial justice was in error in denying his motion for judgment of acquittal on the grounds that there was no evidence of force or coercion.

When ruling on a motion for judgment of acquittal, the trial justice and this court on review must consider the evidence presented and the reasonable inferences to be drawn therefrom in the light most favorable to the state. *State v. Burke*, 522 A.2d 725, 734 (R.I.1987); *State v. Pignolet*, 465 A.2d 176, 184 (R.I.1983). Unless the evidence viewed in this light is insufficient to

---

2. The statute was subsequently modified to establish separate offenses involving children of tender age. *See* G.L. 1956 (1981 Reenactment) §§ 11–37–8.1 and 11–37–8.3, as amended by P.L. 1984, ch. 59, § 2.

support a jury verdict beyond a reasonable doubt, the motion should be denied. *Burke,* 522 A.2d at 734; *State v. Wilshire,* 509 A.2d 444, 452 (R.I.1986).

Section 11–37–2(B) provides that a person is guilty of first-degree sexual assault if he or she engages in sexual penetration of another person, not a spouse, if the accused uses force or coercion. Section 11–37–4(B) provides that an accused is guilty of second-degree sexual assault if he or she engages in sexual contact by means of force or coercion.

Section 11–37–1, as amended by P.L. 1984, ch. 152, § 1, provides that the term "force or coercion" shall apply when the accused does any of the following:

"(A) uses or threatens to use a weapon, or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon.

"(B) overcomes the victim through the application of physical force or physical violence.

"(C) coerces the victim to submit by threatening to use force or violence on the victim and the victim reasonably believes that the accused has the present ability to execute these threats.

"(D) coerces the victim to submit by threatening to at some time in the future murder, inflict serious bodily injury upon or kidnap the victim or any other person and the victim reasonably believes that the accused has the ability to execute this threat."

■ The defendant argues that there is no evidence of physical force or threat of physical force to induce the complainant's sexual submission. Although we agree that there is no evidence of brutal or violent action on the part of defendant, it is abundantly clear from the record that this young girl's participation in the long series of sexual assaults upon her was anything but consensual. Her participation was unwilling and submissive from the start. She repeatedly but unsuccessfully asked her stepfather to stop when he penetrated her vagina, she told him she was in pain, she tried to push him away, and she tried to crawl away from him. She said that she was afraid of him after the sexual activity began.

This court has already decided that psychological coercion comes within the definition of "force and coercion." We have held that implied threats from a person in authority will establish guilt under the sexual-assault statute. *State v. Burke,* 522 A.2d at 734–35. In that case, a uniformed police officer used his position and obvious authority to cause a young woman who suffered from alcoholism to submit to his sexual advances. We stated that "[a] command on the part of one who possesses complete authority and overwhelming force to back up that authority need not be accompanied by an explicit threat in order to be effectively coercive." *Id.* at 735.

We stated in *Burke,* 522 A.2d at 735, that a threat is:

" 'any menace of such a nature and extent as to unsettle the mind of a person on whom it operates and to take away from his [or her] acts that free, voluntary action which alone constitutes consent.' * * * A threat may consist of the imposition of psychological pressure on one who, under the circumstances, is vulnerable and susceptible to such pressure."

We agree with the position taken by the Supreme Court of Pennsylvania when it addressed the definition of force, coercion, or compulsion as used in sexual-assault statutes. In *Commonwealth v. Rhodes,* 510 Pa. 537, 557, 510 A.2d 1217, 1227 (1986), it stated that:

"There is an element of forcible compulsion, or the threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so where the child knows and trusts the adult. In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult suffi-

cient to induce the child to submit to the wishes of the adult * * * without the use of physical force or violence or the explicit threat of physical force or violence."

The evidence established that defendant was the "boss" of the household. He made most decisions, and if there was a decision to be made about discipline, defendant had the final word. He decided if the young girl could attend a social function or have a date. He disbursed her allowance. She was answerable to him for household chores. He was a very strict parent about her schoolwork and all other activity, and she obeyed him. The evidence is uncontradicted that the victim was ignorant of matters of a sexual nature until defendant undertook to initiate her one month after she reached her thirteenth birthday.

When she tried to put an end to the incestuous acts, defendant punished this deaf youngster in a particularly cruel manner, by withdrawing from her and refusing to communicate until she could not stand the "silence" any more. And so she gave in. She could not tell her mother because defendant had told her that the mother would have a nervous breakdown. The prospect of her mother's being ill in a hospital leaving her alone with defendant, was unthinkable, worse than submitting to the weekly assaults.

There is no doubt that the victim's submission was brought about by coercion, applied by defendant. The motion for judgment of acquittal, therefore, was correctly denied.

■ Finally, defendant argues that the trial justice abused his discretion in denying his motion to pass the case because the victim left the courtroom obviously in tears during the prosecutor's final argument.

The trial justice described the incident in detail when he decided the motion. It was clear to the judge that the jury saw the victim leave the courtroom and also saw a young girl who was sitting with her leave the courtroom shortly thereafter.

In his instructions the trial justice mentioned the incident and admonished the jurors that if they did see it, it could not play any part in their deliberations. He reminded them again that their verdict must be based on what was presented at trial and not on sympathy, prejudice, or bias. He then stated that anyone who saw the event and felt that it would affect his or her verdict should so indicate by raising his or her hand and he would ask for his or her honest answer. No jurors responded. He then asked them directly whether "that incident [will] affect any of you in the course of deliberations," and the record reflects that the jurors signified that it would not by "nodding in the negative."

■ A decision of a trial justice on a motion to pass a case and declare a mistrial is within the sound discretion of that trial justice. *State v. Fernandes*, 526 A.2d 495, 498 (R.I.1987). The decision to deny such a motion will be accorded great weight and will not be disturbed on appeal unless it is clearly wrong. *State v. Brown*, 522 A.2d 208, 210 (R.I.1987). The jurors unanimously assured the trial justice that they would not be affected by the event. The defendant has failed to show any actual prejudice other than the guilty verdict that was adequately supported by the evidence. Consequently, we conclude that there was no abuse of discretion by the trial justice in denying the motion to pass.

For these reasons the defendant's appeal is sustained in part and denied in part. The judgments of conviction on counts 1 and 2 are vacated, and those charges are dismissed. The judgments of conviction on counts 3 and 4 are affirmed, the appeal regarding those counts is denied and dismissed, and the papers of the case are remanded to the Superior Court.